FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

07 AUG -3 PM 12:09

OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STEVEN R. BLAIR, | ) | Civil Action No. 8:07CV295 |
| Plaintiff. | ) | |
| vs. | ) | |
| CITY OF OMAHA, and DOUGLAS COUNTY, political subdivisions existing and organized in the State of Nebraska, RANDY ANDERSON, KEVIN HOUSH, DONALD TRUCKENBROD, MICHAEL SCOTT, JASON CHRISTENSEN, PAUL KOLTZ, PATRICIA OSIER, JEFFREY MORGAN, LAWRENCE REYNARD, and MORGAN LARSON police officers, all sued in their individual and official capacity, JAMES SKINNER and DONALD CAREY in their capacity as Chief of Police, JANE and JOHN DOE Members of Crime Victim's Association, LEIGH ANN RETELSDORF, MIKE MALONEY, individual and official capacity, PATRICK RISKOWSKI, MARC DELMAN, WILLIAM EUSTICE, Attorneys at Law, PATTY DORY, and LORI ANZALDO, DONALD HAMILTON MARY LIKES, and GREGORY SCHATZ, district court judges, individual and official capacity. | ) | COMPLAINT AND DEMAND FOR A JURY TRIAL |
| Defendants. | ) | |

COMES NOW the plaintiff and for his causes of action against defendants, alleges and states as follows:

### JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States, particularly Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States and the State of Nebraska, the Civil Rights Act, Title 42 U.S.C. Section 1981, 1983, 1985, 1986,and 1988.
2. The jurisdiction of this Court is invoked for plaintiff's causes of action under the provisions of 28 U.S.C. Sections 1331 and 1343, which confer original

1

      jurisdiction on Federal District Courts to sit and redress the deprivation under color of statute, ordinance, regulation, custom, or usage of rights, privileges, and immunities secured to the plaintiff by the Fourteenth Amendment to the Constitution of the United States; including the right to due process and equal protection of the law.
3. Plaintiff invokes the supplemental jurisdiction of this court to decide plaintiff's state law claims under the doctrine of pendent jurisdiction.
4. At all times relevant to this complaint, defendants acted under color and pretense of the law to wit; under color of statute, ordinance, regulation, custom, or usage of the State of Nebraska
5. At all time relevant to this complaint, defendants engaged in illegal conduct herein mentioned to the injury of the plaintiff and deprived him of his rights, privileges, and immunities secured to him by the Fourteenth Amendment to the Constitution of the United States and the State of Nebraska.
6. Venue is proper in this district because it is where the parties reside and where the events complained of took place.
7. Racial discrimination based on race, practice, policies............???

## PARTIES

8. Plaintiff was at all times relevant to this complaint a citizen of the United States, State of Nebraska, residing at 2035 Maple Street, Omaha, Nebraska.
9. The defendant, City of Omaha, Nebraska, is a political subdivision organized and existing in the State of Nebraska, operating under the control of the City Council Committee.
10. The defendant, Douglas County, Nebraska, is a political subdivision organized and existing in the State of Nebraska, operating under the authority of the Board of Commissioners.
11. The defendant, Randy Anderson, aka Randy Simplisski, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
12. The defendant, Kevin Housh, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
13. The defendant, Donald Truckenbrod, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
14. The defendant, Michael Scott, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
15. The defendant, Jason Christensen, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
16. The defendant, Paul Koltz, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
17. The defendant, Patricia Osier, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
18. The defendant, Jeffrey Morgan, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.

19. The defendant, Lawrence Reynard, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
20. The defendant, Morgan Larson, was at all times relevant hereto, acting under color of law, both individually and in his official capacity.
21. The defendant, James N. Skinner, was at all times relevant hereto, acting under color of law, as Chief of Police, both individually and in his capacity.
22. The defendant, Donald Carey, was at all times relevant hereto, acting under color of law, as Chief of Police, both individually and in his capacity.
23. The defendant, Leigh Ann Retelsdorf, was at all times relevant hereto, acting under color of law, as Deputy County Attorney, both individual and official capacity.
24. The defendant, Michael Maloney, a private attorney, was at all times relevant hereto, acting under color of law, as Special Prosecutor, both individual and official capacity.
25. The defendant, Marc Delman, was at all times relevant hereto, a private attorney, both individual and official capacity.
26. The defendant, Patrick Riskowski, was at all times relevant hereto, a private attorney, both individual and official capacity.
27. The defendant, William Eustice, was at all times relevant hereto, a private attorney, both individual and official capacity.
28. The defendant, Patty Dory, was as all time relevant hereto, acting under color of law, individual capacity.
29. The defendant, Lori Anzaldo, was as all time relevant hereto, acting under color of law, individual capacity.
30. The defendant, Donald J. Hamilton, was at all times relevant hereto, acting under color of law, individual and official capacity.
31. The defendant, Mary Likes, was at all times relevant hereto, acting under color of law, individual and official capacity.
32. The defendant, Gregory Schatz, was at all times relevant hereto, acting under color of law, individual and official capacity.

## FACTS

33. That on May 12, 1997, at approximately 5:00 p.m., the plaintiff, Steven R. Blair, was sitting inside his residence located at 2035 Maple Street when he observed (2) Omaha police cruisers and a teal green unmarked vehicle parking in front of his residence.
34. That as several officer approached the front steps to his residence he proceeded to the front door and met officer's Donald (Truckenbrod) and Kevin (Housh) at the front screen door to his porch.
35. That Truckenbrod asked the plaintiff to identify himself. Plaintiff stated that he was Steven Blair. Truckenbrod then asked the plaintiff if he knew a party by the name of Patty Dory. Plaintiff answered to the affirmative.
36. Truckenbrod then requested that the plaintiff step outside of the residence. Plaintiff complied, latching the front screen door behind him as he exited the front porch.

37. Truckenbrod and Housh then handcuffed the plaintiff with Housh escorting him to a police cruiser, placing him inside.
38. That officers lacked reasonable suspicion or probable cause to arrested plaintiff rendering his seizure unconstitutional under the Fourth Amendment.
39. As he was being escorted plaintiff observed officer's Truckenbrod, Jason (Christensen), and Michael (Scott) enter his residence.
40. Said defendants spent approximately 30 minutes in the residence searching and questioning the remaining occupants inside.
41. Plaintiff observed the officer's remove a 12 gauge shotgun from the residence, while sitting in the cruiser.
42. Plaintiff then observed Truckenbrod go over towards the teal green unmarked vehicle and speak with Detective Randy (Anderson).
43. Plaintiff was then transported to Omaha Police Headquarters at about 5:30 p.m.
44. That shortly thereafter, plaintiff's mother, Charlene Blair, arrived at police headquarters on inquiry about plaintiff's arrest.
45. That she was told by police personnel that plaintiff was not there.
46. The plaintiff remained in the booking department incommunicado for some six hours until he was taken upstairs to an interview room.
47. Detective Anderson entered the interview room and while reading the plaintiff his Miranda rights, stated "we know where you were at 12:00 midnight."
48. Plaintiff declined the interview with Anderson and was taken back to booking where he was charged with numerous felonies and committed to the City jail without bond.
49. That plaintiff's mother lodged complaints, and threatened to sue the city about plaintiff's unlawful arrest and false charges, with Mayor Daub, the Omaha City Council, and James Skinner who declined to take any action.
50. Plaintiff was taken before a magistrate who set bond at $150,000.00 dollars or 10% thereof for kidnapping, terroristic threats, and use of a deadly weapon to commit a felony.
51. The plaintiff was found guilty at a bench trial and sentenced to a prison term served at the Nebraska State Penitentiary.
52. The plaintiff appealed the matter to the Nebraska Appellate Courts which affirmed his conviction.
53. Plaintiff filed for postconviction relief and was granted a new trial based on him receiving ineffective assistance from his attorney's.
54. The plaintiff appealed the decision of the trial court to the Nebraska Court of Appeals as the district court failed to rule on the presentation false testimony, false evidence, prosecutorial misconduct, and failure to disclose material information as required under Brady v. Maryland set forth in his motion for postconviction relief.
55. Plaintiff's two former lawsuits were dismissed without prejudice. Additionally, plaintiff cause is not barred by Heck v. Humphrey.
56. Plaintiff has served his sentence for the two underlying charges of kidnapping and terroristic threats whereby he received 10 to 15 on the kidnapping and 4 to 5 for terroristic threats. Plaintiff began his sentence on May 12, 1997, and was unconditionally released from prison on December 14, 2005.

## FIRST CAUSE OF ACTION

### (Unlawful Search and Seizure)

57. Plaintiff realleges paragraphs 1-56, and incorporates them by this reference as if fully set forth herein and further alleges:
58. That officers Truckenbrod, Christensen, and Scott entered plaintiff's residence without warrant and without consent of any party authorized to give such consent, and searched the residence, resulting in the seizure of certain items of evidence, specifically, but not limited to a shotgun and rifle.
59. That no exigent circumstances existed justifying officers intrusion into the plaintiff's privacy, nor were officers acting under any other recognized exception to the warrant requirement.

## SECOND CAUSE OF ACTION

### (False Arrest)

60. Plaintiff realleges paragraphs 1-59, and incorporates them by this reference as if fully set forth herein and further alleges:
61. The plaintiff was arrested at his residence located at 2035 Maple Street, at approximately 5:00 p.m., by defendants Truckenbrod, Housh, Scott, Christensen, and Anderson.
62. On said date plaintiff was arrested by said police officers against his will, and without justification.
63. That plaintiff was transported to Omaha Police Headquarters by Housh and held at the city jail incommunicado.
64. That officer Lawrence (Reynard) and Morgan (Larson) conspired to hold plaintiff incommunicado by failing to follow Nebraska Jail Standards. Finally booking plaintiff into jail some six to seven hours after his arrival and formally charging him with numerous felony charges.
65. That Reynard and Morgan denied that plaintiff was being held when his mother arrived at Omaha police Headquarter some fifteen to twenty minutes after his illegal arrest.
66. That Reynard and Morgan refused to grant plaintiff his constitution right by failing to formally book, charge, and jail the plaintiff upon his arrival. Further that they denied plaintiff any access to a telephone, medical treatment, and bathroom privileges.
67. That while plaintiff was being held, incommunicado, Patty (Dory), Lori (Anzaldo), and Anderson met at the Anzaldo residence at approximately 6:00p.m.
68. That during that meeting Anderson, Dory, and Anzaldo started developing a story to justify plaintiff's arrest. That Anderson instructed them to make a 911 emergency call and report that Dory had been assaulted by the plaintiff.

5

69. That Anzaldo and Dory, upon instruction from Anderson, then placed a 911 emergency call, at 6:32 p.m., reporting that Dory had been assaulted by the plaintiff.
70. That officer Anderson testified at plaintiff's trial under oath, after referring to his hand written report, that uniformed officers responded at 5:45 p.m.
71. That officer Housh testified at plaintiff's trial under oath, that the incident was reported between 5:30 p.m. and 5:45 p.m., and that he was the first officer to arrive on the scene.
72. That officer Christensen testified at plaintiff's trial under oath, that he believed he went to the plaintiff's home at 5:00 p.m., to make the arrest.
73. That plaintiff subpoenaed the actual 911 call information, from the Omaha 911 Communications Center, which documents that the 911 emergency call was received at 18:32 hours. (6:32 p.m.)
74. In detaining plaintiff, said officers were engaged in the regular course of and within the scope of their employment with the City of Omaha. As such the City of Omaha and Douglas County are liable for the actions of these officers.

## THIRD CAUSE OF ACTION

(Abuse of Process)

75. Plaintiff realleges paragraphs 1-74, and incorporates them by this reference as if fully set forth herein and further alleges:
76. That on or about May 14, 1997 Anderson, Anzaldo, and Dory caused a felony indictment to go forward alleging that the plaintiff committed the various felonies. Subsequent to the commencement of such action the defendant's abused the legal process of arrest to cover up plaintiff's unlawful arrest.
77. Said defendant's abused their arrest powers by using it for the ulterior motive or purpose of having plaintiff defend against manufactured charges. Such purpose was not legitimate, regular, or legal in the use of arrest powers.
78. Subsequent to the issuance of the indictment defendants committed willful acts that was not proper in the use of such process. The act or acts of misuse were manufacture to justify plaintiff's unlawful arrest and search and seizure of his residence, further sentencing him to a prison term.
79. That James (Skinner) and Donald (Carey) were the acting police chief at or during plaintiff's arrest and trial proceedings.
80. That Plaintiff's unlawful arrest, illegal search and seizure, and manufactured charges were brought to the attention of Skinner and Carey who refused to intervene in the matter.
81. Skinner and Carey had a duty to properly train, supervise, and disciplines said officers under their direct control, but choose to let them run amuck.

## FOURTH CAUSE OF ACTION

(Malicious Prosecution)

82. Plaintiff realleges paragraphs 1-81, and incorporates them by this reference as if fully set forth herein and further alleges:
83. That sometime on or after May 12, 1997, defendants maliciously conspired to falsely charge plaintiff with the crime of kidnapping, terroristic threats, use of a weapon to commit a felony, and failure to appear. In pursuance of this conspiracy, defendants maliciously procured false testimony and false evidence to be given before the honorable judge Likes, Spethman, and Hamilton, in Douglas County district courts, by means of which they caused plaintiff to be wrongfully indicted on May ??, 1997, for the crimes mentioned-above. The indictment was presented to the district court; plaintiff was arraigned on it and plead not guilty.
84. In April of 1998 trial was held on the indictment in the district court, at a bench trial. During the trial, defendants introduced false evidence and perjured testimony of witnesses by fraud, perjury, or other means, which they corruptly and maliciously procured, and which they knew to be false.
85. Defendant Retelsdorf tendered false testimony from officer Housh and Christensen concerning what time they arrested the plaintiff.
86. Relesdorf knew or should have known that she was tendering false testimony from the police officers by virtue of their written reports and trial testimony which places them on the scene at 5:30 p.m., one hour before the 911 emergency call was actually placed.
87. Retelsdorf knew or should have known that she was tendering false testimony from police officer concerning Dory's alleged injuries by virtue of the medical reports she received from the Crime Victims Association or forwarded to her from Immanuel Hospital. Said medical records document that no injuries of the type depicted in the Polaroid pictures offered into evidence and testified to by the defendants were found on Dory's person during her examination at Immanuel Hospital.
88. That Jane and John Doe member of the Crime Victims Association owed a duty to the plaintiff to forward the results of Dory's medical exam to the County Attorney's Office. Further that they had a duty to come forward for the defense with evidence which exonerated the plaintiff of the crimes he allegedly committed.
89. Instead Retelsdorf and members of the Crime Victims Association conspired with other state actors to bring about and unlawful conviction through their secreting, failing to disclose, and remaining silent regarding Dory's medical condition.
90. Retelsdorf knew or should have known about the medical records but choose to conceal Dory's medical records in violation of Brady v. Maryland.
91. Retelsdorf knew or should have known that she was tendering false testimony from officer Jeffrey Morgan concerning the alleged shotgun blast Dory claimed was made by the plaintiff whereby he allegedly fired a shotgun through his living room wall.

92. That Retelsdorf knew or should have known by virtue of the holes depicted in the photos taken of living room walls that the holes were not made by a shotgun blast.
93. That Morgan offered perjured testimony by testifying at trial that the holes in the walls above the air vents were made by a shotgun blast. Further that Morgan offered perjured testimony by stating that the holes above the air vents were back to back instead of side by side as they truly exist even today.
94. Retelsdorf knew or should have known that she was tendering false testimony from officer Housh by virtue of the synopsis provided by Detective Anderson after conducting a lengthy interview with Dory whereby she stated that the plaintiff kidnapped her at 12:00 midnight.
95. That Retelsdorf intentionally tendered perjured testimony from Housh by proffering that Dory was kidnapped by the plaintiff at 4:00 a.m.
96. Retelsdorf knew or should have known that she was tendering false testimony from Anderson by virtue of officer Housh's hand written report whereby Dory stated that the plaintiff called her at 4:00 a.m., and threatened to kill her children.
97. That Retelsdorf intentionally tendered perjured testimony from Anderson by proffering that Dory's story was consistent. Further that Retelsdorf intentionally left out Dory's detailed version of events summarized by Anderson in his synopsis of the alleged kidnapping which was to have allegedly taken place at 12:00 midnight.
98. That Retelsdorf intentionally withheld the victim medical records which exonerated the plaintiff in that Dory was severely beaten, one month later after plaintiff's arrest, by her ex-boyfriend. This occurred while the plaintiff was being held in jail on an extremely high bond. It should be noted that plaintiff and his witnesses testified to Dory being beaten up on various occasions before plaintiff's unlawful arrest.
99. Retelsdorf violated plaintiff's rights to call witnesses on his behalf by threatening to arrest plaintiff's key witness, Debra (Wright). Retelsdorf knew did not have a warrant for her arrest, but told plaintiff's attorney, Marc (Delman), that if Wright took the stand she would have her arrested.
100. Wright appeared in the courtroom at the close of trial during the reading of the verdict. When the Honorable Judge Donald (Hamilton) stated that the plaintiff did not call Wright, who would have made a difference in the outcome of the trial, Wright stood up and said "here I am," the court said it was too late.
101. Retelsdorf saw Wright in the courtroom and did not have her arrested by the sheriff stationed in the courtroom. Retelsdorf knew her allegations concerning Wright having a warrant was false, but used her prosecutorial powers to prevent Wright from testifying on behalf of the plaintiff.
102. The plaintiff intended on calling Robert (Baker), the victim's brother as a defense witness. Retelsdorf knew that (Baker), Dory's was a defense witness. In conspiring with Delman and William (Eustice) to have plaintiff's bond revoked used Dory's false statement to declare Baker as a state witness.
103. Retelsdorf never intended to call Baker as a state witness, but manipulated the system to her advantage. Retelsdorf further conspired with Delman to ensure

8

Baker would show up for trial. Delman waited until the day Baker was to testify to issue a subpoena

104. By reason of this false testimony, introduction of false evidence, perjured testimony of witnesses, fraud, or other means the court returned a verdict of guilty. Judgment was entered, and plaintiff was sentenced by the court to the term of imprisonment prescribed by law.
105. In April of 1999, plaintiff perfected an appeal from the judgment of conviction, which was affirmed by the Nebraska Supreme Court.
106. On January 2000, plaintiff filed a verified motion to vacate sentence and conviction, alleging among other things police and prosecutorial misconduct.
107. Plaintiff's petition was being ignored by the trial court for numerous months (12) or more until he called the State Court Administrator and complained.
108. Plaintiff was immediately given to a different judge who then granted an evidentiary hearing and appointed a special prosecutor, Mike Maloney, was appointed to the case to investigate government official's misconduct.
109. Instead Maloney ignored the facts set forth in plaintiff's postconviction motion and presented false testimony and false evidence to the court regarding plaintiff's arrest, and search and seizure.
110. Defendant Maloney refused to allow defendant Dory, Anzaldo, Anderson, Housh, Truckenbrod, and Christensen's deposition to take place.
111. It is the primary duty of all prosecuting attorneys, including any **special prosecutors,** not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused.
112. On August 8, 2003, the district court vacated plaintiff's sentence and conviction and ordered a new trial as plaintiff received ineffective assistance of counsel. Subsequently the plaintiff was unconditionally released from prison. Plaintiff was imprisoned for 8 years and six months as a result of the conviction maliciously procured by defendants.
113. However, the plaintiff appealed the district court's judgment on postconviction relief for the court failure to rule on the issues of prosecutorial misconduct, false testimony, false evidence, failure to disclose under a violation of Brady v. Maryland.
114. Defendants acted maliciously, and had no reasonable or probable cause for instituting the prosecution of plaintiff, in that his arrest was without probable cause and the victim allegation of a crime were unfounded as Dory's story changed from minute to minute.
115. Defendant's Retelsdorf and Maloney were not acting in good faith. Plaintiff was prosecuted in an effort to extinguish legal action plaintiff and his parent stated they would file upon his unlawful arrest and illegal search and seizure of his residence.
116. That they allowed the process to go forward despite the fact that no probable cause existed at the time for plaintiff arrest. That Retelsdorf and Maloney continued the malicious prosecution against the plaintiff in a concerted effort to remove liability from the City of Omaha and all other defendant's named in this suit.

## FIFTH CAUSE OF ACTION

### (False Imprisonment)

117. Plaintiff realleges paragraphs 1-116, and incorporates them by this reference as if fully set forth herein and further alleges:
118. That on May 12, 1997, defendants unlawfully arrested plaintiff without a warrant or any other legal process and took plaintiff into custody, against the will of the plaintiff, and without probable cause.
119. After arresting plaintiff, defendant brought plaintiff to Omaha Police Headquarters were he was held unlawfully until he was brought before a magistrate judge, and transferred to the Omaha Correctional facility.
120. Plaintiff was unlawfully convicted and sentenced to a term of imprisonment and finally released from the Nebraska Department of Corrections on December 14, 2005.
121. During this time period, neither defendant...................., nor any member of the city's police department, city council, correction al facility, make any attempt to conduct an investigation so as to determine if in fact there was probable cause to arrest and detain plaintiff.
122. Plaintiff did not commit an offense and defendant police officers did not have any reasonable cause for believing that plaintiff committed any offense.

## SIXTH CAUSE OF ACTION

### (Conspiracy)

### Paul Koltz and Patricia Osier

123. Plaintiff realleges paragraphs 1-122, and incorporates them by this reference as if fully set forth herein and further alleges:
124. That Anderson documents in his synopsis, page 15, that he was advised by Crime Lab Technician Patricia Osier who took photographs of visible injuries to Dory, that she observed injuries about Dory's chest and breast area, left bicep and upper arm, lower back and lower legand left calf area, and visible marks about her neck where plaintiff attempted to choke her.
125. That in an Omaha Police Department form for a request for laboratory service Paul (Koltz) documents that he received eleven photographs that were allegedly taken of Dory's injuries in the Crime Lab on May 13, 1997, signed by (Osier) and booked into evidence.
126. That on May 14, 1997, Anderson documents in a Property Data Report that he turned over 5 photographs (one stop) of Dory's injuries and a blue/white hooded shirt, signed by Koltz who allegedly booked them into evidence.
127. That on May 12, 1997, Housh files a Property Report which documents that he turned over 5 photographs of Dory's injuries, signed by Osier.

128. However, Housh's original Property Report is void of any signature as to the person receiving said property. That during the discovery phase of the postconviction proceedings Osier signed her signature as if she signed it back in 1997 before it was sent to plaintiff's attorney.
129. That no photographs were taken by Osier in the Crime Lab on May 12, 1997, as documented in the request for laboratory services. Further that all photographs presented at trial were enlargements of the (one stop) photos booked into evidence by Anderson. That said photographs are void of any date/time stamp as required.
130. That during postconviction proceeding, plaintiff attorney obtained an order compelling Immanuel Hospital to turn over Dory's medical records. Contained within said records were the attending physician's medical findings which state that no injuries to Dory's person were found. It should be noted that Dory was taken to Immanuel Hospital by members of the Crime Victim's Association, a day or two after the alleged photographs were allegedly taken.
131. That defendant's Koltz and Osier manufactured false evidence which was used against the plaintiff at trial.
132. That defendant's Koltz and Osier acted individually and in concert with other state actors, willfully, knowingly, and in bad faith, with the specific intent of malice to deprive plaintiff of his of constitutional rights and equal protection under the law.

### Jeffrey Morgan

133. That defendant Jeffrey (Morgan) participated in searching the plaintiff's residence pursuant to a valid warrant. That Morgan directed pictures be taken of two holes above the air vents in the plaintiff's living room walls.
134. That the air vents are approximately ten feet apart on the west wall in plaintiff's living room.
135. That Morgan conspired with state actors by falsely testifying that the holes were made by a shotgun blast. Further that the holes in the living room walls were back to back, as if there was a hole straight through the living room wall, going from the living room into the wall in the front entry way.
136. That defendant Morgan acted individually and in concert with other state actors, willfully, knowingly, and in bad faith, with the specific intent of malice to deprive plaintiff of his of constitutional rights to a fair trial and equal protection under the law.

### Jane and John Doe Members of the Crime Victim's Association

137. That on or about May13, 1997, members of the Crime Victim's Association accompanied Dory to Immanuel Hospital to document her alleged injuries for later used against the plaintiff at trial.
138. That upon the completion of the exam it was apparent to the members of the

        Crime Victim's Association that Dory had not received the alleged injuries documented in the reports of Anderson, Housh, Koltz, and Osier.
139. That said member forwarded their findings to the appropriate office for use by the County Attorney Office in plaintiff's criminal case.
140. That said members knew of the manufactured evidence that was to be used against the plaintiff, but choose to remain silent and go along with the injustice that was being perpetrated against the plaintiff.
141. That defendant Jane and John Doe members acted individually and in concert with other state actors, willfully, knowingly, and in bad faith, with the specific intent of malice to deprive plaintiff of his of constitutional rights to a fair trial and equal protection under the law.

### Delman, Eustice and Riskowski

142. That attorneys Marc (Delman), Patrick (Riskowski), William (Eustice) denied plaintiff of his constitutional rights to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution by conspiring with state actors to convict and sentence plaintiff to a prison term.
143. That Delman, Riskowski, and Eustice misrepresented material facts with the intent to induce plaintiff to rely on them, knew they were false, plaintiff did so rely on them, to his detriment.
144. That after a dispute arose between the plaintiff and Eustice's client, Robles, on how plaintiff was to repay bond monies. Eustice devised a plan whereby Dory, Delman, and Retelsdorf conspired to have plaintiff's bond revoked. The defendants acted in concert with each other, acted willfully, knowingly, and in bad faith, with the specific intent of malice to deprive plaintiff of his rights to equal protection under the law.
145. Shortly thereafter, plaintiff received a call from Eustice who informed him that he had to appear for a bond review in Spethman's court.
146. Plaintiff met Eustice in the court house. Plaintiff asked Eustice where Delman was and he stated that Delman was in the courtroom.
147. Upon arriving in the courtroom Delman was not present. Eustice went forward with the bond review hearing as if he was plaintiff's attorney until plaintiff informed the court that Eustice was not his attorney. The court continued the hearing.
148. Plaintiff called Delman upon exiting the courtroom and made an inquiry as to why he was not present for the hearing. Delman stated that he was no longer plaintiff's attorney, that Eustice had made his appearance in the case and terminated the phone conversation.
149. That following Monday Delman called plaintiff requesting that he come out to his office. Delman stated Dory said the plaintiff went out to Baker's job and threatened him. Plaintiff informed Delman that it was a lie. Plaintiff had Delman call Baker, who told Delman that Dory was lying.
150. During that phone call plaintiff requested that Baker call Retelsdorf and informed her of Dory's lie. Baker then called Retelsdorf who told Baker not to talk to the plaintiff.

151. Delman informed the plaintiff that he would go down and straighten the matter out. Plaintiff's bond was revoked for failure to appear. No hearing was held in regards to the violation of conditions of release.
152. Plaintiff was subsequently arrested and charged with failure to appear.
153. That before trial plaintiff met with Delman on several occasions and explained the discrepancies in the police reports, time of arrest, and Anderson's relationship with state actors Dory and Anzaldo.
154. That Delman misrepresented to the plaintiff that the actual 911 emergency call was placed at 5:30 p.m, that Dory did not go to the hospital, and that U.S. West did not keep track of local telephone calls. All of which was intended to keep plaintiff off track so the plan to railroad the plaintiff would work out.
155. Defendants, Delman conspired with state actors by intentionally providing ineffective assistance of counsel by failing to challenge plaintiff's unlawful arrest, illegal search and seizure, presentation of false evidence, false testimony, and call defense witnesses Wright, Baker, Roper, the attending physician who conducted the examination on Dory, and other defense witnesses.
156. Delman further conspired with state actors by intentionally providing ineffective assistance of counsel by failing to file a motion for discovery or subpoena telephone records, 911 call information, police logs, and Dory's medical records.
157. That plaintiff asked Delman if he should be offering into evidence the police reports which directly contradicted the state's witness's trial testimony. That Delman stated that this was a bench trial and if the state's witnesses testified to anything different than what was in the police reports the judge would through the case out. That there was no need to use the reports to impeach the state witnesses.
158. Delman acted in concert with state actors in railroading the plaintiff into a term of imprisonment by failing to properly cross-examine the states witnesses with evidence that directly contradicted their trial testimony.
159. That Delman further conspired with state actors by allowing items, of illegally obtained evidence, from plaintiff's residence to be offered into evidence without objection.
160. That Delman further conspired with state actors by allowing polaroid pictures to be received into evidence, depicting injuries to Dory, which were not date/time stamped which the court considered in finding plaintiff guilty.
161. That plaintiff hired attorney Patrick (Riskowski) to represent him in a motion for new trial and further to the appellate courts. That plaintiff informed Riskowski of Delman's statement concerning the the procedure at a bench trial, Dory's statements concerning treatment at Immanuel Hospital, Delman's comments about concerning U.S.West telephone records, and 911 call decrepancies.
162. Riskowski confirmed that U.S.West did not keep telephone records, and that Dory did not go to the hospital. Riskowski further stated that he would investigate the other matters before filing the motion for new trial, but

participated in the conspiracy by failing to investigate, remaining silent, and not assigning error regarding Delman's fraudulent misrepresentations.
163. Riskowski filed the motion for new trial, brief in support, and affidavits he prepared, alleging that several witnesses did not testify. Riskowski offering the defense witnesses testimony in the form of affidavit instead of live testimony subject to cross-examination.
164. Riskowski intentionally failed to call witnesses to testify, investigate the 911 call discrepancies, medical and telephone records, all of which should have been addressed at the hearing on the motion for a new trial
165. On appeal plaintiff requested that Riskowski address the issue of ineffective assistance of counsel regarding Delman's errors. That Riskowski maintained that ineffective assistance of counsel could only be raised during postconviction proceedings.
166. That as a result of Riskowski's fraudulent misrepresentation and inaction plaintiff's conviction on direct appeal was sustained.
167. That on or about June 8, 1999, Riskowski informed plaintiff that he would prepare a poctconviction motion geared directly towards Delman's preparation and decisions at trial.
168. Riskowski prepared the postconviction motion, but with issues that were procedurally barred as they should have been raised on direct appeal.
169. Plaintiff caught on to Riskowski's fraudulent actions and filed a motion to dismiss Riskowski as his attorney of record. The Honorable Mary Likes granted said motion and appointed Patrick Dunn stating that he was failure with the case.
170. Riskowski acted individually and in concert with other state actors, willfully, knowingly, and in bad faith, with the specific intent of malice to deprive plaintiff of his of constitutional rights to a fair trial and equal protection under the law.

      Donald Hamilton, Mary Likes,Gregory Schatz,
      City of Omaha and Douglas County

171. The city and the courts have a policy and practice whereby they intentionally discriminate against blacks to sentence them to a term of imprisonment, especially where the victim is white and the alleged wrongdoer is black. Commonly known, as railroading. Studies have brought forth these racial disparities yet the city, county attorney's office, court appointed attorneys and the justices continue to conspire and carry on the practice. Statistics show that although blacks make up a very small percentage of the Omaha population they out number other racial groups significantly in terms of imprisonment and larger sentences.
172. That Hamilton, Likes, and Schatz acted in bad faith and clear absence of all jurisdiction and such jurisdictional deficiency was known by the judges when they acted.

WHEREFORE, the plaintiff demands judgment against the defendants; jointly and severally, for compensatory damages of $10,000,000.00 and punitive damages to be determined by a jury, plus cost and attorney fees, and such other relief as the Court deems just and equitable.

### REQUEST FOR A JURY TRIAL

The plaintiff request that a jury trial be held on this matter in Omaha, Nebraska.

Dated this 6th day of August, 2007.
        3rd

By: _____
    Steven R. Blair, pro se

### VERIFICATION

I, Steven R. Blair, the above-named plaintiff, being first duly sworn on oath, deposes and states that I know the contents of the foregoing complaint and facts contained therein are true as I verily believe.

_____
Affiant/Plaintiff

STATE OF NEBRASKA   )
                    )ss.
COUNTY OF DOUGLAS )

Subscribed and Sworn to before me this 3 day of August, 2007.

GENERAL NOTARY - State of Nebraska
HELEN KLAUMANN
My Comm. Exp. Jan. 25, 2009

_____
Notary Public

15